**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | | |
|---|---|---|
| Kimberly Johnson, individually and on behalf all others similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | **CASE NO. 22-CV-01034** |
| | ) | |
| v. | ) | **CLASS ACTION** |
| | ) | |
| Pingora Asset Management, LLC, and Pingora Loan Servicing, LLC, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant(s). | ) | |
| | ) | |

**CLASS ACTION COMPLAINT**

Plaintiff Kimberly Johnson ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant Pingora Asset Management, LLC, and Pingora Loan Servicing, LLC (collectively "Pingora" or "Defendant"). Plaintiff seeks to obtain damages, restitution, and injunctive relief for a class of individuals ("Class" or "Class Members") who also received notices of the data breach from Pingora. Plaintiff makes the following allegations upon information and belief, except as to her own actions, the investigation of her counsel, and the facts that are a matter of public record.

## I.   NATURE OF THE ACTION

1.   This class action arises out of the recent cyberattack and data breach ("Data Breach") that was perpetrated against Defendant Pingora, a company that holds itself out as "a specialized asset manager focused on investing in and servicing of new production performing mortgage servicing right (MSR) portfolios."[1]

---

[1] https://pingorafund.com/about-us/ (last accessed on April 26, 2022).

2.     According to its website, Pingora uses a third-party subservicer to provide the loan servicing and explains that mortgage subservicers perform the day-to-day servicing activities on loans, such as collecting payments and administering escrow accounts. On its computer network, Pingora holds and stores certain personally identifiable information ("PII") of the Plaintiff and the putative Class Members, who are individuals whose mortgage servicing rights Pingora either "currently or previously owned."[2]

3.     Pingora emphasizes on its website that the "subservicers companies' computer networks were not involved in this incident."[3]

4.     As a result of Pingora's Data Breach, Plaintiff and thousands of Class Members, suffered ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the attack.

5.     In addition, Plaintiff's and Class Members' sensitive personal information—which was entrusted to Defendant—was compromised and unlawfully accessed due to the Data Breach.

6.     The private information compromised in the Data Breach included names, addresses, dates of birth, Social Security numbers (the holy grail for identity thieves), loan numbers, and for some, the accessed files included information provided for a mortgage loan application, loan modification, or other items related to mortgage loan servicing (collectively, the "Private Information").[4] On notices to certain State Attorneys General, Pingora states that the stolen data also includes driver's license numbers, state identification cards, and financial and

---

[2] *Id.*
[3] *Id.* (emphasis original).
[4] *See* Notice Letter, attached as Exhibit A.

banking information.[5]

7.      The Private Information compromised in the Data Breach was exfiltrated by the cyber-criminals who perpetrated the attack and remains in the hands of those cyber-criminals.

8.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect Class Members' Private Information.

9.      Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that they collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information was accessed.

10.     Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

11.     Defendant disregarded the rights of Plaintiff and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that they did not have adequately robust computer systems and security practices

---

[5] *See, e.g.,* https://www.atg.wa.gov/pingora-loan-servicing-llc (last accessed on April 27, 2022).

to safeguard Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

12.     In addition, Defendant and its employees failed to properly monitor the computer network and systems that housed the Private Information. Had Defendant properly monitored its property, it would have discovered the intrusion sooner.

13.     Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

14.     Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

15.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

16.     Plaintiff and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

17.     Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed during the Data

Breach.

18.     Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

19.     Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct.

## II.     PARTIES

23.     Plaintiff Kimberly Johnson is and at all times mentioned herein was an individual citizen of the State of Alabama, residing in the city of Hoover. Pingora Loan Servicing, LLC currently or in the past owned the servicing rights to Plaintiff Johnson's current or a former mortgage.  Pingora used a third party to provide servicing of that loan. As a condition of Plaintiff's loan servicing, she was required to provide her PII to Defendant either directly or indirectly. Plaintiff received notice of the Data Breach on or about April 6, 2022.  A copy of the notice she received is attached as Exhibit A (the "Notice Letter").

24.     Defendants Pingora Asset Management, LLC and Pingora Loan Servicing, LLC are Limited Liability Companies registered in Wilmington, Delaware. Both maintain their principal place of business at 1819 Wazee Street, 2nd Floor, Denver, Colorado, 80202. Defendants can be served through their registered agent at: Corporation Service Company, 1900 W. Littleton Blvd., Littleton, Colorado 80120.

25.     All of Plaintiff's claims stated herein are asserted against Defendant Pingora and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

26.     The names and capacities of persons, entities, associates, and/or corporations who may be responsible for some of the claims alleged in this Complaint are currently unknown to

Plaintiff. If necessary, Plaintiff will seek leave of Court to amend this complaint to reflect the true names and capacities of other responsible parties as their identities are learned.

### III.    JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

18.     The Court has general personal jurisdiction over Defendant because, personally or through its agents, Defendant operated, conducted, engaged in, or carried on a business or business venture in Colorado; has its headquarters in Colorado; committed tortious acts in Colorado; and/or breached a contract in Colorado by failing to perform acts required by the contract to be performed in Colorado. Venue is proper because a substantial portion of the events complained of occurred in this District.

### IV.    STATEMENT OF FACTS

**A.    Nature of Defendant's Business.**

27.     Defendant is a "specialized asset manager focused on investing in and servicing of new production performing mortgage servicing right ("MSR") portfolios."[6]

28.     According to Defendant's website, "Pingora Asset Management LLC is led by a team of mortgage industry executives with market leading experience in sourcing and executing MSR transactions and navigating key regulatory and business relationships in the mortgage industry."[7]

---

[6] https://pingorafund.com/about-us/ (last accessed April 27, 2022).
[7] *Id.*

29.     Defendant boasts about using a "tech-enabled and human assisted digital solutions" to assist its clients with strengthening its customer relationships.

30.     According to Defendant, it has "partnered with global brands for over 3 decades now —working with them across their consumer value chain and providing new age customer experience solutions and insights that are helping them define and reach their target audiences with greater efficiency and better value for every dollar spent."

31.     Defendant "is led by a team of industry veterans who have over 60 years' collective experience evaluating, acquiring and selling Mortgage Servicing Rights; performing valuations, trading and hedging, ensuring compliance with regulatory requirements and performing servicer oversight."[8] Upon information and belief, Plaintiff and Class Member's Mortgage Servicing Rights were either acquired or acquired and sold by Pingora.

32.     On information and belief, in the course of collecting Private Information from or about mortgage holders, including Plaintiff and Class Members, Pingora promised to provide confidentiality and adequate security for Private Information through its applicable privacy policy and in compliance with statutory privacy requirements applicable to the mortgage servicing industry.

33.     In its notice letters to Plaintiff and Class Members, Pingora admits that it "understands the importance of protecting the information [it] maintain[s]". [9]

34.     Plaintiff and the Class Members, as former and current mortgage holders, relied on the promises and duties of Pingora and their mortgage subservicers in this sophisticated business entity to keep their sensitive PII confidential and securely maintained, to use this information for

---

[8] https://pingorafund.com/ (last accessed April 27, 2022).
[9] *See* Notice Letter, Exhibit A.

business purposes only, and to make only authorized disclosures of this information. Mortgage holders, in general, demand security to safeguard their PII, especially when Social Security numbers and other sensitive PII is involved.

35. In the course of their mortgage applications and servicing, including Plaintiff and Class Members, provided Pingora with at least the following Private Information:

    a.  names;

    b.  addresses;

    c.  mortgage application information;

    d.  credit information;

    e.  dates of birth; and

    f.  Social Security numbers.

36. Pingora had a duty to adopt reasonable measures to protect Plaintiff's and Class Members' PII from involuntary disclosure to third parties.

**B.**    **The Data Breach**.

37. According to its Notice Letters, in early December 2021, a "security incident involving unauthorized access to Pingora file servers" was discovered. Pingora indicates that it took steps to "contain the incident, notify law enforcement, and [engage] a forensic investigation firm." The investigation determined that Pingora's file storage servers were accessed for over a month—from October 27, 2021 to December 7, 2022 before the Data Breach was noticed.[10]

38. Finally, on or about March 7, 2022, Pingora was able to narrow down the list of individuals, including Plaintiff and Class Members, "whose name, address, loan number, and

---

[10] *Id.*

Social Security number were included in the [accessed] files." Pingora also admits that "for some" (without divulging to Plaintiff or Class Members whether they were in the "some") the stolen data also includes Private Information provided "in connection with a loan application, loan modification, or other items regarding loan servicing."[11]

39.     Upon information and belief, the cyberattack was targeted at Defendant, due to its status as mortgage servicing entity that collects, creates, and maintains PII.

40.     Because of this targeted cyberattack, data thieves were able to gain access to and obtain data from Pingora that included the Private Information of Plaintiff and Class Members.

41.     The files stolen from Pingora contained at least the following information of Plaintiff and Class Members: first names, last names, addresses, loan numbers, and Social Security numbers.

42.     The Private Information contained in Pingora's network was not encrypted.

43.     Plaintiff's Private Information was accessed and stolen in the Data Breach.  Plaintiff believes her stolen Private Information is currently available for sale on the Dark Web because that is the *modus operandi* of cybercriminals.

44.     As a result of the Data Breach, Pingora is informing Plaintiff and Class Members of "additional steps you can take in response to the incident" and also encouraging Class Members to enroll in credit monitoring, fraud consultation, and identity theft restoration services.[12]

45.     That Pingora is encouraging Plaintiff and Class Members to enroll in credit monitoring and identity theft restoration services is an acknowledgment that the impacted consumers are subject to a substantial and imminent threat of fraud and identity theft.

---

[11]*Id.*
[12] *Id.*

46.     Pingora had obligations created by contract, industry standards, and common law to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

47.     Pingora could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PII.

### Defendant Acquires, Collects, and Stores Plaintiff's and Class Members' PII.

48.     Pingora acquires, collects, and stores a massive amount of personally identifiable information ("PII") of the mortgage holders, including Plaintiff and Class, whose servicing rights it buys and sells for profit.

49.     By obtaining, collecting, and using Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

50.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

51.     Plaintiff and the Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### The Data Breach was a
### Foreseeable Risk of which Defendant was on Notice

48.     It is well known that PII, including social security numbers in particular, is an invaluable commodity and a frequent target of hackers.

49.     Individuals place a high value not only on their PII, but also on the privacy of that data. This is because identity theft causes "significant negative financial impact on victims" as well as severe distress and other strong emotions and physical reactions.

50.     Individuals are particularly concerned with protecting the privacy of their Social

Security numbers, which are the "secret sauce" that is "as good as your DNA to hackers."

51.     Data Breach victims suffer long-term consequences when their social security numbers are taken and used by hackers. Even if they know their social security numbers are being misused, Plaintiff and Class Members cannot obtain new numbers unless they become a victim of social security number misuse.

52.     The Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same."[13]

53.     In 2021, there were a record 1,862 data breaches last year, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[14]

54.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Pingora knew or should have known that its electronic mortgage servicing records would be targeted by cybercriminals.

55.     Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a cyber-attack.

56.     Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its

---

[13] https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed April 27, 2022).
[14] https://www.cnet.com/tech/services-and-software/record-number-of-data-breaches-reported-in-2021-new-report-says/ (last accessed April 27, 2022).

own acknowledgment of its duties to keep PII private and secure, Pingora failed to take appropriate steps to protect the PII of Plaintiff and the proposed Class from being compromised.

### At All Relevant Times Pingora Had a Duty to Plaintiff and Class Members to Properly Secure their Private Information

57.     At all relevant times, Pingora had a duty to Plaintiff and Class Members to properly secure their PII, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion, act reasonably to prevent foreseeable harm to Plaintiff and Class Members, and to promptly notify Plaintiff and Class Members when Pingora became aware that their PII may have been compromised.

58.     Pingora's duty to use reasonable security measures arose as a result of the special relationship that existed between Pingora, on the one hand, and Plaintiff and the Class Members, on the other hand. The special relationship arose because Plaintiff and the Members of the Class entrusted Pingora with their PII as a condition of their mortgages being serviced by Pingora.

59.     Pingora had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information. Accordingly, Pingora breached its common law, statutory, and other duties owed to Plaintiff and Class Members.

60.     Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

     a. Maintaining a secure firewall configuration;

     b. Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

     c. Monitoring for suspicious or irregular traffic to servers;

     d. Monitoring for suspicious credentials used to access servers;

     e. Monitoring for suspicious or irregular activity by known users;

     f. Monitoring for suspicious or unknown users;

     g. Monitoring for suspicious or irregular server requests;

       h.   Monitoring for server requests for PII;

       i.   Monitoring for server requests from VPNs; and

       j.   Monitoring for server requests from Tor exit nodes.

61.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[15] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[16]

62.     The ramifications of Pingora's failure to keep consumers' PII secure are long lasting and severe. Once PII is stolen, particularly Social Security and driver's license numbers, fraudulent use of that information and damage to victims may continue for years.

### The Value of Personal Identifiable Information

63.     The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200.[17]

64.     Criminals can also purchase access to entire company data breaches from $900 to $4,500.[18]

65.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an

---

[15] 17 C.F.R. § 248.201 (2013).

[16] *Id.*

[17] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[18] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[19]

66.     What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

67.     Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[20]

68.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[21]

69.     PII can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number.  This can be accomplished alone, or in combination with

---

[19] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf.

[20]   Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[21]   Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[22]

70.     Given the nature of the Data Breach, it is foreseeable that the compromised PII can be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Class Members' PII can easily obtain Class Members' tax returns or open fraudulent credit card accounts in Class Members' names.

71.     The information compromised in this Data Breach is static and difficult, if not impossible, to change (such as Social Security numbers).

72.     To date, Pingora has offered Plaintiff and Class Members only one year of identity monitoring service. The offered services are inadequate to protect Plaintiff and Class Members from the threats they face for years to come, particularly in light of the PII at issue here.

73.     The injuries to Plaintiff and Class Members were directly and proximately caused by Pingora's failure to implement or maintain adequate data security measures for its current and former customers.

### *Pingora Failed to Comply with FTC Guidelines*

74.     Federal and State governments have likewise established security standards and issued recommendations to temper data breaches and the resulting harm to consumers and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[23]

75.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[24] The guidelines note businesses should protect the personal consumer and

---

[22] *See* OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n. 1.

[23] Federal Trade Commission, *Start With Security, available at*: https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf

[24] Federal Trade Commission, *Protecting Personal Information: A Guide for Business, available at*: https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business

consumer information that they keep, as well as properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.

76.     The FTC recommends that companies verify that third-party service providers have implemented reasonable security measures.[25]

77.     The FTC recommends that businesses:

    a.   Identify all connections to the computers where you store sensitive information.

    b.   Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

    c.   Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

    d.   Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

    e.   Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks

    f.   Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

    g.   Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from

---

[25] FTC, *Start With Security*, *supra* note 23.

the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls— settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

78.    The FTC has brought enforcement actions against businesses for failing to protect consumer and consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

79.    Because Class Members entrusted Pingora with their PII, Pingora had, and has, a duty to the Class Members to keep their PII secure.

80.    Plaintiff and the other Class Members reasonably expected that when they provide PII to Pingora, Pingora would safeguard their PII.

81.    Pingora was at all times fully aware of its obligation to protect the personal and financial data of mortgage holders, including Plaintiff and members of the Class. Pingora was also aware of the significant repercussions if it failed to do so.

82.    Pingora's failure to employ reasonable and appropriate measures to protect against

unauthorized access to confidential consumer data—including Plaintiff's and Class Members' first names, last names, addresses, loan numbers, and Social Security numbers, and other highly sensitive and confidential information—constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

### Plaintiff and Class Members Have Suffered Concrete Injury As A Result Of Defendant's Inadequate Security And The Data Breach It Allowed.

83.    Plaintiff and Class Members reasonably expected that Defendant would provide adequate security protections for their PII, and Class Members provided Defendant with sensitive personal information, including their names, addresses, loan numbers, and Social Security numbers.

84.    Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain.  Plaintiff and other reasonable former and current mortgage holders understood and expected that, as part of that business relationship, they would receive data security, when in fact Defendant did not provide the expected data security.  Accordingly, Plaintiff and Class Members received data security that was of a lesser value than what they reasonably expected.  As such, Plaintiff and the Class Members suffered pecuniary injury.

85.    Cybercriminals capture PII to exploit it; the Class Members are now, and for the rest of their lives will be, at a heightened and substantial risk of identity theft.  Plaintiff has also incurred (and will continue to incur) damages in the form of, *inter alia*, loss of privacy and costs of engaging adequate credit monitoring and identity theft protection services.

86.    The cybercriminals who obtained the Class Members' PII may exploit the information they obtained by selling the data in so-called "dark markets."  Having obtained these names, addresses, Social Security numbers, and other PII, cybercriminals can pair the data with other available information to commit a broad range of fraud in a Class Member's name, including but not limited to:

- obtaining employment;
- obtaining a loan;

- applying for credit cards or spending money;

- filing false tax returns;

- stealing Social Security and other government benefits; and

- applying for a driver's license, birth certificate, or other public document.

87.     In addition, if a Class Member's Social Security number is used to create false identification for someone who commits a crime, the Class Member may become entangled in the criminal justice system, impairing the person's ability to gain employment or obtain a loan.

88.     As a direct and/or proximate result of Defendant's wrongful actions and/or inaction and the resulting Data Breach, Plaintiff and the other Class Members have been deprived of the value of their PII, for which there is a well-established national and international market.

89.     Furthermore, PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.

90.     Accordingly, Defendant's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiff and the other Class Members at an imminent, immediate, and continuing increased risk of identity theft and identity fraud.[26]  Indeed, "[t]he level of risk is growing for anyone whose information is stolen in a data breach."[27]  Javelin Strategy & Research, a leading provider of quantitative and qualitative research, notes that "[t]he theft of SSNs places consumers at a substantial risk of fraud."[28]  Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported.  Even data that have not yet been exploited by cybercriminals bears a high risk that the cybercriminals who now possess

---

[26] *Data Breach Victims More Likely To Suffer Identity Fraud*, INSURANCE INFORMATION INSTITUTE BLOG (February 23, 2012), http://www.iii.org/insuranceindustryblog/?p=267.

[27] Susan Ladika, *Study: Data Breaches Pose A Greater Risk*, CREDITCARDS.COM (July 23, 2014), http://www.creditcards.com/credit-card-news/data-breach-id-theft-risk-increase-study-1282.php.

[28] THE CONSUMER DATA INSECURITY REPORT: EXAMINING THE DATA BREACH- IDENTITY FRAUD PARADIGM IN FOUR MAJOR METROPOLITAN AREAS, (*available at* https://www.it.northwestern.edu/bin/docs/TheConsumerDataInsecurityReport_byNCL.pdf).

Class Members' PII will do so at a later date or re-sell it.

91.     As a result of the Data Breach, Plaintiff and Class Members have already suffered damages.

92.     Defendant openly admits that the cybercriminals "acquired" and "obtained" Plaintiff's and Class Members' data in the Breach.

***Plaintiff Johnson's Experience***

93.     Prior to the Data Breach Plaintiff Johnson had a mortgage that, upon information and belief, is or was being serviced by Pingora or for which Pingora owned the servicing rights. Prior to receiving the Notice of Data Breach Letter (attached as Exhibit A), Ms. Johnson was not aware that Pingora was involved with her mortgage servicing.

94.     In the course of applying for her mortgage and as a condition of her loan, Plaintiff Johnson was required to supply with her PII, including but not limited to her name, address, date of birth, Social Security number, and other financial information. At the time that she provided this private information, she was assumed and assured her information would be protected by mortgage lender and any other business entity, including Pingora, that later serviced her mortgage.

95.     Plaintiff Johnson received the *Notice of Data Breach* on or about April 11, 2022, over 5 months after cyber criminals first had access to Pingora's computer network.

96.     Since the Data Breach, Plaintiff Johnson has experienced an increase in the number of spam emails and texts, which appear to be placed with the intent of obtaining personal information to commit identity theft by way of a social engineering attack.  As a result, Plaintiff Johnson was required to spend time obtaining a credit report and monitoring her credit history and financial accounts for suspicious activity.

97.     In response to the Notice of Data Breach, Plaintiff spent time dealing with the consequences of the Data Breach, which included and will include time spent verifying the legitimacy of the Notice of Data Breach, exploring credit monitoring and identity theft insurance options, and self-monitoring her accounts. In addition, she contacted all three credit agencies and placed freezes on her credit to hopefully prevent or reduce the risk of fraudulent activities on her

accounts. She now spends about an hour per week monitoring her financial accounts. The time she is forced to spend monitoring and securing her accounts has been lost forever and cannot be recaptured.

98.     Plaintiff is very careful about sharing PII and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

99.     Plaintiff suffered actual injury and damages as a result of the Data Breach. Implied in her mortgage servicing contract owned by or sold to Pingora was the requirement that it adequately safeguard her PII. Plaintiff would not have permitted Pingora's loan servicing had her mortgage company or Pingora disclosed that it lacked data security practices adequate to safeguard PII.

100.    Plaintiff suffered actual injury in the form of damages and diminution in the value of her PII—a form of intangible property that she entrusted to Pingora for the purpose of securing a mortgage which was compromised by the Data Breach.

101.    Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy, especially her Social Security number. She has been notified by Facebook and when paying bills that her Private Information and Social Security number have been found on the Dark Web. In addition, she has received notices of "suspicious activity" related to some of her financial accounts.

102.    Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her stolen PII, especially her Social Security number, being placed in the hands of unauthorized third-parties and possibly criminals.

103.    Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Pingora's possession, is protected and safeguarded from future breaches.

## V.   CLASS ACTION ALLEGATIONS

104.   Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated ("the Class").

105.   Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All persons whose Private Information was maintained on Defendant Pingora's computer systems that were compromised in the Data Breach, and who were sent Notice of the Data Breach.

106.   Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

107.   Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

108.   <u>Numerosity</u>.  The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists of thousands of persons whose data was compromised in Data Breach.

109.   <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

> A.  Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;
>
> B.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;
>
> C.  Whether Defendant's data security systems prior to and during the Data Breach

complied with applicable data security laws and regulations;

D. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

E. Whether Defendant owed a duty to Class Members to safeguard their Private Information;

F. Whether Defendant breached its duty to Class Members to safeguard their Private Information;

G. Whether computer hackers obtained Class Members' Private Information in the Data Breach;

H. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

I. Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

J. Whether Defendant's conduct was negligent;

K. Whether Defendant's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

L. Whether Defendant's acts, inactions, and practices complained of herein violated the Colorado data protection laws invoked below;

M. Whether Defendant failed to provide notice of the Data Breach in a timely manner; and

N. Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

110. Typicality. Plaintiff's claims are typical of those of other Class Members because

Plaintiff's Private Information, like that of every other Class member, was compromised in the Data Breach.

111.    Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class.  Plaintiff's Counsel are competent and experienced in litigating Class actions.

112.    Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' Private Information was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

113.    Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

114.    Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

115.    Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular

issues include, but are not limited to:

    O.  Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

    P.  Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

    Q.  Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

    R.  Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

    S.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

116.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Pingora.

## CAUSES OF ACTION

### FIRST COUNT
**Negligence**
**(On behalf of Plaintiff and All Class Members)**

117.    Plaintiff re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

118.    Defendant required Plaintiff and Class Members to submit non-public PII as a condition of receiving a mortgage loan, or alternatively, Defendant purchased mortgage servicing rights from a third-party knowing that as a condition of that purchase it would receive non-public PII that it must protect from disclosure.

119.   Plaintiff and the Class Members entrusted their PII to Defendant with the understanding that Defendant would safeguard their information.

120.   Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

121.   By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer network—and Class Members' PII held within it— to prevent disclosure of the information, and to safeguard the information from theft.  Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

122.   Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

123.   Defendant had a duty to employ reasonable security measures and otherwise protect the PII of Plaintiff and Class Members pursuant to Colo. Rev. Stat. § 6-1-713.5.

124.   Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

125.   Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

   a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

   b.  Failing to adequately monitor the security of its networks and systems;

   c.  Failing to periodically ensure that its email system had plans in place to

maintain reasonable data security safeguards;

    d.   Allowing unauthorized access to Class Members' PII; and

    e.   Failing to detect in a timely manner that Class Members' PII had been compromised.

126.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members.  Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the industry.

127.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

128.    There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the PII and the harm suffered, or the imminent risk of harm suffered by Plaintiff and the Class.

129.    As a result of Defendant's negligence, Plaintiff and the Class Members have suffered and will continue to suffer damages and injury including, but not limited to: out-of-pocket expenses associated with procuring robust identity protection and restoration services; increased risk of future identity theft and fraud, the costs associated therewith; time spent monitoring, addressing and correcting the current and future consequences of the Data Breach; and the necessity to engage legal counsel and incur attorneys' fees, costs and expenses.

130.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

131.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**SECOND COUNT**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and All Class Members)**

132.    Plaintiff re-alleges and incorporates by the paragraphs above as if fully set forth herein.

133.    Plaintiff and Class Members were required to provide their PII to Defendant as a condition of their mortgage applications and servicing by Defendant.

134.    Plaintiff and Class Members provided mortgage payments and servicing profits to Defendant in exchange for (among other things) Defendant's promise to protect their PII from unauthorized disclosure.

135.    On information and belief, at all relevant times Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiff and Class Members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

136.    On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

137.    Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

138.    When Plaintiff and Class Members provided their PII to Defendant as a condition of their mortgages, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

139.    Defendant required Class Members to provide their PII as part of Defendant's

regular business practices.  Plaintiff and Class Members whose loans were purchased by Defendant accepted Defendant's offers and provided their PII to Defendant.

140.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

141.    Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.  Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

142.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

143.    Defendant breached its implied contracts with Class Members by failing to safeguard and protect their PII.

144.    As a direct and proximate result of Defendant's breaches of the implied contracts, Class Members sustained damages as alleged herein.

145.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

146.    Plaintiff and Class Members are also entitled to nominal damages for the breach of implied contract.

147.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members for a period longer than the inadequate one-year currently offered.

### THIRD COUNT
### Unjust Enrichment
### (On Behalf of Plaintiff and All Class Members)

148.    Plaintiff restates and realleges the paragraphs above as if fully set forth herein.

149.    Plaintiff alleges Count III (unjust enrichment) solely in the alternative to Count II (breach of implied contract).

150.    Plaintiff and Class Members conferred a monetary benefit on Defendant by providing Defendant with profits from the servicing of their mortgages.

151.    Defendant appreciated that a monetary benefit was being conferred upon it by Plaintiff and Class Members and accepted that monetary benefit.

152.    However, acceptance of the benefit under the facts and circumstances outlined above make it inequitable for Defendant to retain that benefit without payment of the value thereof. Specifically, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information.  Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite data security.

153.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary benefit belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures.

154.    Defendant acquired the PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

155.    If Plaintiff and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant.

156.    Plaintiff and Class Members have no adequate remedy at law.

157.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered or will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

158.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

159.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them.

**FOURTH COUNT**
**Negligence *Per Se***
**(On Behalf of Plaintiff and All Class Members)**

160.    Plaintiff re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

161.    Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

162.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce,"

including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

163.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect consumers PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiff and Class Members.

164.    Defendant's violation of Section 5 of the FTC Act constitutes negligence per se as Defendant's violation of the FTC Act establishes the duty and breach elements of negligence.

165.    Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

166.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

167.    In addition, Defendant's conduct violated Colo. Rev. Stat. § 6-1-713.5. Colo. Rev. Stat. § 6-1-713.5 requires commercial entities who maintain, own, or license "personal identifying information of an individual residing in the state" to "implement and maintain reasonable security procedures and practices that are appropriate to the nature of the personal identifying information and the nature and size of the business and its operations."

168.    Defendant failed to comply with Colo. Rev. Stat. § 6-1-713.5.   Specifically, Defendant voluntarily undertook the act of maintaining and storing Plaintiff's PII, but Defendant failed to implement safety and security procedures and practices sufficient to protect from the data breach that it should have anticipated.   Defendant should have known and anticipated that data breaches—especially mortgage loan data—were on the rise, and that mortgage banking institutions were lucrative or likely targets of cybercriminals looking to steal PII.   Correspondingly, Defendant

should have implemented and maintained procedures and practices appropriate to the nature and scope of information compromised in the data breach.

169.     Plaintiff and Class Members are within the class of persons that Colo. Rev. Stat. § 6-1-713.5 was intended to protect.

170.     Defendant's failure to comply with applicable laws and regulations constitutes negligence per se.

171.     But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

172.     The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that they were failing to meet their duties, and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their PII.

173.     As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

## FIFTH COUNT
### Invasion of Privacy by Intrusion
### (On Behalf of Plaintiff and All Class Members)

174.     Plaintiff repeats and re-alleges each and every allegation contained in the paragraphs above as if fully set forth herein.

175.     The State of Colorado recognizes the tort of Invasion of Privacy by Intrusion, and adopts the formulation of that tort found in the Restatement (Second) of Torts, which states:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts § 652B (1977).

176.    Plaintiff and the Class Members had a reasonable expectation of privacy in the Private Information Defendant mishandled.

177.    By intentionally failing to keep Plaintiff's and the Class Members' Private Information safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiff's and Class Members' privacy by intrusion.

178.    Defendant knew that ordinary persons in Plaintiff's or the Class Members' positions would consider this an invasion of privacy and Defendant's intentional actions highly offensive and objectionable.

179.    Defendant invaded Plaintiff's and the Class Members' right to privacy and intruded into Plaintiff's and the Class Members' private affairs by intentionally misusing and/or disclosing their Private Information without their informed, voluntary, affirmative, and clear consent.

180.    Defendant intentionally concealed from Plaintiff and the Class Members an incident that misused and/or disclosed their Private Information without their informed, voluntary, affirmative, and clear consent.

181.    In failing to protect Plaintiff's and the Class Members' Private Information, and in intentionally misusing and/or disclosing their Private Information, Defendant acted with intentional malice and oppression and in conscious disregard of Plaintiff's and the Class Members' rights to have such information kept confidential and private.

182.    Plaintiff and the Class Members sustained damages (as outline above) as a direct and proximate consequence of the invasion of their privacy by intrusion, and therefore seek an award of damages.

**SIXTH COUNT**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and All Class Members)**

183.    Plaintiff re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

184.    In providing their Private Information to apply for a mortgage and for its servicing, Plaintiff and Class Members justifiably placed special confidence in Defendant to act in good faith and with due regard to interests of Plaintiff and Class Members to safeguard and keep confidential that Private Information.

185.    Defendant Pingora accepted the special confidence placed in it by Plaintiff and Class Members, as evidenced by its admission in the Notice letter that it "understand the importance of protecting the information [it] maintain[s]."

186.    Defendant also notes in its Privacy Notice that it "want[s] to pledge our commitment, at the outset, to respect your personal medical information."

187.    There was an understanding between the parties that Pingora, as a mortgage servicer, would act for the benefit of Plaintiff and Class Members in preserving the confidentiality of their Private Information.

188.    In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became guardians of Plaintiff's and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of consumer mortgagees, including Plaintiff and Class Members, for the safeguarding of Plaintiff's and Class Members' Private Information.

189.    Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its business relationship, in particular, to keep secure the Private Information of past and current mortgage holders.

190.    Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discovery, investigate, and give notice of the Cyber-Attack and data breach in a reasonable and practicable period of time.

191.    Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' Private Information.

192.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by

failing to timely notify and/or warn Plaintiff and Class Members of the Cyber-Attack and data breach.

193.   Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights.

194.   Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations.

195.   Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to identify and respond to suspected or known security incidents and to mitigate, to the extent practicable, harmful effects of security incidents.

196.   Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI.

197.   Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to ensure compliance with standard security rules.

198.   Defendant breached its fiduciary duties owed to Plaintiff and Class Members by impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons.

199.   Defendant breached its fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

200.   As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated

with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Cyber-Attack and data breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Cyber-Attack and data breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of Defendant's services they received.

201.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    For an Order certifying this action as a class action and appointing Plaintiff and her counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.    For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

D.  For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E.  Ordering Defendant to pay for lifetime credit monitoring services for Plaintiff and the Class;

F.  For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G.  For an award of punitive damages, as allowable by law;

H.  For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

I.  Pre- and post-judgment interest on any amounts awarded; and

J.  Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: April 28, 2022                    Respectfully submitted,

/s/ Rick D. Bailey
Rick D. Bailey, Esq.
Atty. Reg. #26554
**Law Office of Rick D. Bailey, Esq.**
1801 Broadway, Ste. 528
Denver, Colorado 80202
Phone: (720) 676-6023
Email: rick@rickbaileylaw.com

Gary E. Mason
Danielle L. Perry*
Lisa A. White*
**MASON LLP**
5301 Wisconsin Avenue, NW, Suite 305
Washington, DC 20016
Tel: (202) 429-2290
Email: gmason@masonllp.com

38

Email: dperry@masonllp.com
Email: lwhite@masonllp.com


*pro hac vice to be filed                    *Attorneys for Plaintiff*